I appreciate your working us into your schedule. Whenever you're ready, Reuters. Happy to hear from you. Mr. Reuters has just been arguing in the other court. It comes straight from there to here. I hope I fare better. Your Honors, thank you very much. We're here, of course, to question the legality of a search warrant that was executed at the appellant's address, known as 2601 East Oliver Street in Baltimore, on March the 10th of 2011. There was a large investigation. Judge Traxler and I recognize in the government's pleadings that they warn against a myopic examination of probable cause and suggest that there needs to be a more global approach to what it is that a court is looking for, an issuing court is looking for, when that court determines the presence of probable cause. Well, in this case, there were 32 search warrants executed simultaneously throughout the Baltimore metropolitan area. There was an affidavit about 161 pages long, and of those 161 pages, about five dealt specifically with the address which my client happened to be in some way associated with. They're found at the supplemental joint appendix at pages 78 through 83. Now, Your Honor, the government and the district court, when I had filed a motion to suppress, they set forth their top ten reasons why it is that the district court should have found probable cause. They then criticized my examination of those top ten reasons. However, I noticed in their brief to this court, they repeated the same argument, and I believe the argument I made before is appropriate, and that is that those top ten reasons that they gave, and I'd suggest are the only reasons they gave, to support probable cause need to be examined one by one, and I attempted to do that in my papers, not losing sight of the fact that there is an overall investigation that needs to be examined. But I would suggest in this case that the only thing that's really relevant are the five pages that deal with the address in question. Specifically, Your Honors, there's several telephone calls. All of them occurred in mid-October of 2010, and one occurred on November 7th of 2010. On October 14th, and all these phone calls are between the appellant, Mr. Dowdell, and a man named Dana Bowman, a lead defendant in this case, and a man convicted of distributing a somewhat large quantities of marijuana and some other drugs, which had nothing to do with Mr. Dowdell in the metropolitan area. On October 14th, there's a telephone call between Bowman and Dowdell where there's a reference to the word Rick's, and there's also a reference to that they would be upstairs. That's the entirety of that reference. The affiance, which they have a right to indicate that Rickie's is a code word for marijuana, they establish their expertise, and we accept that. There's no indication, however, as to what upstairs they are referring to. Now, they summarize, they continually say that they're referring to 2601 East Oliver Street. The question is, before you get to page 78 of the affidavit, there's no way one can understand how they believe that 2601 East Oliver Street is involved in some fashion in this drug conspiracy. It starts on page 78 with this phone call between Dowdell and Bowman. And, by the way, other than that, there's nothing else mentioned in the affidavit concerning the activities of October 14th, just that phone call. On October 16th, Bowman and Dowdell call again, and there's a reference made by Bowman that Tiny wants two of them, end quote. Dowdell says they're outside and they're easy to get to. Tiny is important, Your Honor, because I recognize that Tiny happens to be a person who, three days subsequent to this, in fact comes in the area and does have some marijuana on her, which I'll discuss in a moment. So I don't diminish the importance of the word, the name Tiny. I don't diminish the importance of the fact that there's two of them. However, the response that Mr. Dowdell gives is they're outside. It doesn't say outside where, Your Honor, just that they're outside. That's October 16th. On October 19th, now, we do get much closer to implicating the particular address that was searched many, many, many months later, and that's because of a series of phone calls between Bowman and Dowdell, and then Bowman and a man named Kevin Jackson, who's also a co-conspirator in this case, also convicted in this case. And what happens is there's a phone call between Bowman and Dowdell where Bowman says that Tiny wants some. Tiny is the person referenced probably three days earlier, and that she'll be coming by in order to get some drugs. Well, there's a surveillance setup this time, and what happens is Tiny is seen in the area of the 2600 block of East Oliver Street. She's never seen going in the house. She's never seen going out of the house. She sees, the surveillance team sees Mr. Bowman not coming out of 2601 East Oliver Street. He's in the area of 2601 East Oliver Street getting out of his vehicle. He gets out of his vehicle, according to surveillance and the affidavit. He and Tiny have a conversation. Certainly there could be an allegation that drugs were exchanged, and Tiny goes her way and Bowman goes his way. No one goes into 2601 East Oliver Street. Surveillance teams then set up, and they stop Ms. Brockington just down the road a little bit. And, in fact, she admits that she has four grams of marijuana on her person. She removes it from her waistband, and the police seize it. They let her go because it's a wire tap-up, and that's fine. The police are attempting to further their investigation. She calls Mr. Bowman because his phone's being tapped and tells him what happened. Bowman then does call Dowdell and tells him what happened. Bowman then calls Jackson and tells Jackson what happened. Bowman then calls back Dowdell and says, you better get the stuff out of there. No reference to 2601 East Oliver Street, but you've got to get the stuff out of there. Dowdell says his girl is taking care of it. A surveillance team sees a woman in the area. They do not see the woman coming out of 2601 East Oliver Street. They see her in the area. They do not indicate who she is. They do not indicate whether that person's associated with that address, but she's in the area. She's seen getting into her vehicle with something in her hands, maybe in a bag or something, and she leaves that area. She's not stopped. The police choose not to stop her for any reason, and that concludes the activities of that day. Notice so far Mr. Dowdell's never seen coming in the address or out of the address. All we know is that he's talking to Mr. Bowman about some address which is never referenced. We then move to November the 7th of 2010, which is the last phone call of any significance, where Bowman and Dowdell are speaking, and there's a reference made to two joints in there, two joints in there. Certainly we all have heard the word joint being used to describe marijuana, but we are not told where in there is, and there's no suggestion as to where it is, except that the affiant says that they know that 2601 East Oliver Street is a stash house. They say that repeatedly, but these are the facts upon which they make that statement. Now, there's only two other references, Your Honors, that ties the location with any criminal activity, and that's on February the 2nd of 2011. Police surveil 2601 East Oliver Street, and what they say is they see a car there. They run the tag. The tag comes back to Angela Stokes. Angela Stokes is the wife of Mr. Armand Dowdell, the appellant. They state in the affidavit that she is known to sell marijuana and to stash marijuana for the conspiracy. Now, Your Honors, there is nowhere in the affidavit of 161 pages where she's ever mentioned, there's nowhere that I'm aware of that anybody has any proof of any type that she sells any marijuana at all. Now, I can't take issue as much with the fact that she's known to stash marijuana for the conspiracy because she lives there, so one can draw an inference that, well, if she lives there, she probably knows what's going on, if anything, and therefore one might make the somewhat disingenuous comment that she stashes marijuana at that house. I can live with that, but I cannot live with the fact that she sells marijuana because there's nothing in the record anywhere to demonstrate that. And then finally, we go to February 24th of 2011. There's a surveillance of the house, and what happens is they say that Mr. Bowman's vehicle, or at least a vehicle associated with Mr. Bowman, is parked near Dowdell's home, which again is 2601 East Oliver Street, at 8 p.m. Now, the only thing that the affidavit says that makes us know that Mr. Dowdell is truly associated with that address is that the police ran a BG&E, Baltimore Gas and Electric, utility run, and his name appeared as the person who has the service at that address. So that certainly attaches him to the address. But in terms of the investigation itself and those telephone calls and so on, there's nothing in the record that ties him with that address, nothing at all. So our argument is this. We believe that the probable cause to implicate the address is at best really, really thin. Now, I recognize fully that this court's job is to see whether or not there was a substantial basis upon which the court below, the issuing court, could have found probable cause and signed that warrant. But we find that there is not enough probable cause stated during that brief time frame in which for the reviewing court to find that there was probable cause for any basis, let alone a substantial basis. Mr. Reuter, I guess I would grant you that taking in isolation the incidences you describe, if taken in isolation, one outside of the context of the others, might not be enough. But as you pointed out at the very beginning of your argument, we don't take these in isolation. The government has painted a mosaic of sorts, and probable cause is not a very demanding standard. Isn't what you just described in toto enough to get the government over that hurdle? Your Honor, I would answer by saying this. Maybe if the government had executed a warrant in late October or early November, the answer might be yes. Well, that goes to staleness, right? Well, that comes into the question of staleness, of course. So our argument is that when you look at the thinness of the probable cause and then you look at the fact that there's nothing that associates any illegal activity with this House from early November of 2010 to March the 10th, that further implicates probable cause as being absent. And, yes, it becomes a staleness issue. But the two, we believe, should be joined together to defeat the whole question of probable cause to begin with. So I do believe that had there been an execution of the warrant the second week in November, as an example, well, you now clearly have the October activity. And, yes, you can argue, Your Honor, that there's some kind of a mosaic that would demonstrate probable cause. I will not concede that point, Your Honor, but I will say that it's a whole lot closer case. Okay. But even if your argument has some lift to it, then how do you get around the fact that these officers acted in other than good faith in assuming the veracity of the magistrate's inspection of this evidence? Your Honor, a couple things. The, I think that this court, this court in U.S. v. Cullen-McKenzie-Goud, G-U-D-E, it's at 671 Fed 3rd, 452, I think written by Judge Motz, says at page 461 that given the finding of fact by the district court that the affiant officers also executed the warrant, the police officers would have had no reason to second-guess the magistrate's imprimatur of her application to search. That tells me, Your Honor, that this court, I believe, is looking at who entered the house and what did they objectively believe to be the case. Well, in this case, we don't know who executed the warrant. There's 32 warrants being executed all at the same time. The chances of the affiants executing the warrant at this house are slim to none, but I have no information, there's nothing in the docket that tells me who executed that warrant at that particular location. But it's those officers who have to have an objective, reasonable belief in the validity of that warrant. The affiants did not execute that warrant, and I think that's what Judge Motz is talking about here. I think that, in part, can defeat the whole issue of good faith. They didn't have any idea. They just showed up and executed the warrant. And I see that as being a weakness, quite frankly, in any good faith argument. If the person executing the warrant doesn't have any idea what the probable cause is or why he or she is there, then I think that good faith is called into question. Further, Your Honor, we argue that when you look at the, what we perceive to be the thinness of the probable cause and the staleness issue combined, that that does defeat a good faith, and that any police officer who would look at the warrant should know, my gosh, we have no evidence of any kind of illegal activity for some five months. Now, I recognize that there are a lot of cases that government counsel cited to which I responded that even have greater periods of time. The period of time is but a factor among many that the reviewing courts should review. And in all those cases, I would submit that where there's a lengthier time between an activity at the place to be searched and the issuing of a warrant, the cases are very much different in terms of the fact pattern of what is going on. Some of those cases routinely deal with record keeping. If a business, as an example, is known to be involved somehow in illegal activity, one can assume that the business may have records, they may keep records of what had happened previously because it is an ongoing business. This is a, from Mr. O'Donnell's standpoint, in terms of what we read in the affidavit, he's got a small involvement in a marijuana distribution scheme at the street level. That's what the tapestry would appear, Your Honor. You're not going to find, there's no way that anybody can argue with a straight face. You're going to find records or something there that demonstrates that he was involved if he was involved in October. The probable cause has to be that he's still doing it today because otherwise you're not going to find anything other than the possibility of drugs in a case like this. So combined, we believe that when you look at the thinness of the probable cause along with the staleness of the last activity involved, that that defeats probable cause and it also defeats a good faith belief in the reasonableness of that insufficiency of that warrant. Thank you, Mr. Reuter. You've got some time remaining. Let's hear from Mr. Block. Thank you very much, Your Honor. Good morning. May it please the Court, I'd like to begin just by clarifying one point from the record from Mr. Reuter's argument. He suggested that the warrant claimed that Mr. Dowdell's wife, Angela Stokes, was also involved in stashing and selling marijuana. That's not actually what the affidavit says. The affidavit on, and this is in the supplemental joint appendix at page 83, says that the vehicle parked in that location is found to be registered to Angela Stokes. Ms. Stokes is the wife of Armand Dowdell, who sells and stashes CDS at 2601 East Oliver. The subordinate clause there refers to Armand Dowdell, not his wife, Angela Stokes. With respect to the sufficiency of this affidavit for purposes of probable cause, I think starting simply with first principles, we have an extremely deferential standard where this Court's role is simply to ensure that there is a substantial basis in the record for the magistrate's decision here. This was a state court judge, a circuit judge from Baltimore City, who in fact had been the judicial officer overseeing the entire wiretap. He had signed all of the wiretap orders. He was intimately familiar with the case, and he reviewed a 160-page affidavit with respect to 32 different locations to determine whether or not there was probable cause. Mr. Reuter's argument, since even though he doesn't concede, he admits that had the warrant been executed in close proximity to the time when the incident with Treon Brockington, also known as Tiny, occurred, that there would have been a sufficient basis in the affidavit to establish probable cause, his argument is essentially one of staleness. And this Court has found, and virtually every other circuit to consider the issue, has found that protracted and continuous criminal activity such as this dramatically reduces the force of any staleness argument. If you consider McCall, which is this Court's decision, considering staleness, McCall suggests that you have to look at the nature of the unlawful activity, the length of the activity, and the nature of the property to be seized. That's at page 1336 of 740 F sub 2. Can I ask you again to tell me what you said our role was in looking at this affidavit, I mean looking at this search warrant? To determine whether there is substantial evidence in the record to support the lower court's finding of probable cause. We don't review it to no vote? No, Your Honor. The standard is a deferential one. If there is a substantial basis for the lower court's decision. You're right. It's a motion to suppress that we review to no vote, not the affidavit. Correct, Your Honor. You're right. Thank you. When you consider the nature of this unlawful activity, we are talking about a drug conspiracy that had been ongoing for five years. The investigation into Mr. Bowman began in 2006. Now, certainly the evidence with respect to Mr. Dowdell comes later, but if you look at the entirety of the affidavit, Mr. Bowman's criminal conduct in this drug conspiracy continues virtually right up until the time that the search warrant is executed. So you have a type of criminal activity, a drug conspiracy, that's not normally shut down on its own accord, and that's something that the court can properly take into account. The length of the activity, simply as to Mr. Dowdell, covers a three-month period from October to December, and this court and other courts have held that a three-month delay in the context of a drug conspiracy does not typically create staleness with respect to probable cause. And then finally, with respect to the nature of the property seized, certainly based on the evidence, I think there's probable cause to believe that drugs would continue to be found at Mr. Dowdell's home, but even if not, the request for documents and records, this court has found that documents and records typically are not moved from one location to another. And documents and records, contrary to Mr. Reuter's argument, are found at the home of a street-level drug dealer, because these conspiracies typically involve what's known as fronting drugs. Drugs are provided to a stash location. The person who lives in or runs that stash location is responsible for distributing those drugs on the street, and certainly that person has to be able to account to the supplier for where those drugs went and provide the money back to the supplier. So it's not the case that documents are never found at a street-level stash house. I think when you consider the totality of the evidence in this affidavit, there is clearly probable cause in March of 2011 to execute this search. Not only do you have the calls in October and November that are identified in the affidavit with respect to 2601 East Oliver, you have an entire compilation of criminal activity that is continuous and ongoing and involves Mr. Bowman. And Mr. Bowman, with respect to staleness, is important, because he is Mr. Dowdell's point of contact in the conspiracy. And what happened in this case, and the reason why we're even hearing a staleness argument, is because this investigation flowed essentially past Mr. Bowman up to his suppliers. And so Mr. Bowman's, the wiretap on Mr. Bowman's phone was cut off in December of 2010 in order to move on to other targets because the investigators believed that they had sufficient evidence against Mr. Bowman, and certainly they did. He pled to distributing more than a kilogram of heroin in this case. They moved on in order to continue the investigation. And as a result, we don't have the wiretapped calls between Mr. Dowdell and Mr. Bowman. But what the affidavit does indicate is that on December 1st of 2010, Albert Wellens was stopped driving a car carrying a box of marijuana that had been shipped from the West Coast. And while it's not detailed in the affidavit in the plea agreement, it indicates that there was a call in which Mr. Bowman told Mr. Wellens, take it up to O's house. O was Mr. Dowdell. O was Dowdell's nickname. So even though that's not in the affidavit, it's certainly something the court can take into account when considering the good faith of the officers in their belief that even after the drugs were moved out, after the tree on Brockington stopped from Mr. Dowdell's home, that once again drugs were flowing through 2601 East Oliver. Now, with respect to Mr. Wellens, who was essentially a package receiver who would then take the marijuana to various stash locations, the affidavit notes, and this is Supplemental Joint Appendix, page 110, that there were 23 calls between Wellens and Bowman between January 23rd and March 9th of 2011. So that certainly suggests that that component of the conspiracy was ongoing and active up until the time that the search warrants were executed. You also have, and admittedly, the suggestion that on February 24th Mr. Bowman's car was parked outside of or right near Mr. Dowdell's house in isolation doesn't appear to tell you much. But in fact, because the investigation had moved on in December beyond Mr. Bowman, in February and March the detectives were essentially going back to make sure that things were continuing to operate in the way they had been before because we knew we were getting ready to execute the search warrants. So in February of 2011 they start going around and looking, are people doing the same things they were doing before? Are we confident that the conspiracy is operating the same way? So you have on Supplemental Joint Appendix, page 83, Mr. Bowman's car parked outside 2601 East Oliver. On SJA 77 you have his car parked at 1602 North Register, which was another heroin and marijuana stash house for Mr. Bowman. That home, that was on February 2nd, that home was occupied by Donovan Sterling and Tabitha Williams. The affidavit notes at that point that there were 68 phone calls between December 2nd and March 2nd between the house phone at 1602 North Register and Mr. Bowman, again indicating Mr. Bowman's active role in this conspiracy was ongoing. It's worth noting the wiretap came down on Mr. Bowman's phones, pen registers stayed in place. And I'm sorry, let me continue my thought on the cars parked. You also have two other instances in which officers went around to ensure that people were continuing to associate in similar ways. So on February 2nd, this is on the 26th page of SJA, you have Chris Wright's car parked at 1119 Springfield. On February 3rd, this is on SJA 42, you have Shawn Johnson's car parked at 11 South Utah, which was Felicia Pearson's home. So this was an investigative technique that they were using to make sure that even though they weren't focused on these individuals day-to-day anymore, that they were still acting in the same way. The detectives could have done more with respect to 2601 East Oliver, certainly. When they drafted the search warrant, there was information from the pen registers reflecting communications between Dowdell and Bowman continuing up until February 13th. And the number of calls were extensive. They didn't put it in. It doesn't defeat probable cause. They put in enough, and that's essentially what we ask officers to do when they prepare an affidavit, to put in enough. And when you have 32 locations and you have a 160-page affidavit, if they had put in every detail of the investigation, we would have had a 1,000-page search warrant. So could they have done more? Yes. Did they do enough? Absolutely. And with respect to this good faith argument, because even if, in light of McCall and Farmer and all the other cases that say when you have a protracted and continuous criminal activity, staleness is a difficult argument to make, even if in this case they didn't quite do enough, it's impossible to believe that with a 161-page affidavit that was reviewed and signed by a circuit court judge in Baltimore City that the officers who executed this warrant weren't relying on that warrant in good faith. It doesn't matter whether the affiance or some other law enforcement officer executed the search warrant. The law enforcement officer who did execute it was certainly relying on the fact that there was a 160-page warrant that had been passed on by a judicial officer. And that law enforcement officer was Keith Benson, who is a detective in Baltimore City, and he testified at the motions hearing. And this is on pages 115 and 116 of the joint appendix, that he had been briefed prior to executing the search warrant on the nature of the investigation, on what they were looking for, and on the existence of the wiretap. He worked closely with the affiance in this case, even though he wasn't one of the affiants on the affidavit. So to suggest that he was not relying in good faith on this affidavit I don't think reflects the reality of how a large-scale drug trafficking operation like this gets taken down in the final stages when you have multiple search warrants to execute at the same time. So that I would ask the court to affirm the district court's denial of the motions to suppress tangible evidence and statements and cede the rest of my time unless there are questions. Okay, thank you very much. Thank you. Mr. Reuter. Your Honor, thank you again. Your Honor, I think as to the statement issue, I believe government counsel concedes in his brief that if the court were to find that the warrant was invalidly signed and executed that indeed the statement of Mr. Dowdell would indeed be suppressible under a Brown v. Illinois argument. So I'm not going to address the statement issue. Just four very quick things, Your Honor. There's no direct evidence that any drugs were ever in that house. No one ever saw any drugs come out of that house. No one ever saw Mr. Dowdell at that house. It was Mr. Bowman who's been investigated since 2008, not Mr. Dowdell. All the other pages are Bowman and others, not Bowman and Dowdell. Dowdell first appears on the radar screen when the wiretap goes up. And lastly, as counsel argues, that the executing officers had a 161-page affidavit in their hands or they should have, they had to have relied upon it in good faith. That's not the test. The test is whether they had an objectively reasonable belief in its validity. If you haven't read it, you don't know what's in it, then you cannot have an objectively reasonable belief. You may have a belief, but that would be subjective, which this court has consistently indicated is not the proper test. It's the objectivity which is important. These executing officers had no such objectively reasonable belief of the validity of that warrant, given how incredibly thin counsel concedes that more could have been done. Well, that's true. The reason more had to be done is in order for it to have been properly issued because it was not. Thank you very much, Your Honor. Thank you, Mr. Duda. I'll ask the clerk to adjourn court, and then we'll come down and agree counsel.
judges: William B. Traxler, Jr., Albert Diaz, Gina M. Groh